In the Matter of the Investigation by the Regular Grand Jury of the County of Kings. Michael F. Reardon, Jr., Appellant; Miles F. McDonald, District Attorney, Kings County, Respondent.

Second Department, May 7, 1951.

*Donato Di Palo* and *Leo Healy,* for appellant.

*Miles F. McDonald, District-Attorney,* in person, *Aaron E. Koota* and *Julius Helfand,* for respondent.

JOHNSTON, J. Appellant seeks to review an order of the County Court, Kings County, entered October 9, 1950, adjudging him guilty of criminal contempt in that, after being sworn as a witness, he refused to answer legal and proper interrogatories before the Grand Jury.

The December, 1949, Kings County Grand Jury has been in session for over a year. Its work not having been completed, its term was duly extended to March 31, 1951, in order to continue its investigation into the '' activities of criminals, racketeers and gamblers within the County of Kings and every and all matters appertaining thereto ''. The focal point of the inquiry revolves about the relationship between gamblers and police officers and whether the latter, for a consideration, condoned and permitted the former to continue their illegal operations.

Appellant, a third grade detective in the police department of the city of New York, appeared before the Grand Jury on September 27, 1950, and, after executing a waiver of immunity, was sworn as a witness and testified. On September 29, 1950, he was recalled before the Grand Jury and gave further testimony.

On September 30, 1950, appellant was served with an order to show cause why he should not be punished for a criminal contempt because of his contumacious and unlawful refusal, after being sworn, to answer legal and proper interrogatories

before the Grand Jury. (Code Crim. Pro., § 619; Judiciary Law, § 750, subd. A, par. 5.) After a hearing, at which appellant was present and represented by counsel, he was adjudged guilty of a criminal contempt and committed to the City Prison for a term of thirty days and, in addition, fined $250. He has served his imprisonment and paid the fine, and appeals from the order.

At the outset, objection is made by counsel for respondent that the order may not be reviewed by appeal and, hence, the appeal should be dismissed. In fact, the District Attorney contends there is no method by which the order may be reviewed — either by appeal, certiorari, or habeas corpus. The District Attorney admits, however, that the question is not free from doubt, and states: " Clarification, we believe is imperative."

That there has been some uncertainty as to the proper method of reviewing an order of criminal contempt has been emphasized more than once. In 1882, the Court of Appeals, speaking of the method of reviewing an order of criminal contempt, recognized that this practice question " has its difficulties " and stated, *obiter dictum,* that, where an order of criminal contempt is made by a criminal court in a criminal proceeding, " Possibly * * * there is no appeal." (*People ex rel. Negus* v. *Dwyer,* 90 N. Y. 402, 406, 407.)

In 1914, this court, speaking of the method of reviewing an order of criminal contempt made in a special proceeding arising out of a civil action, observed:

" Some confusion seems to have arisen as to the proper practice arising either from *dicta* in opinions or because the point as to the proper method of review was not raised. In some instances it has been reviewed by appeal, in others by a writ of certiorari. It makes little practical difference which shall be held to be the proper method, provided only that the practice respecting the same is settled and that it stays settled." (*Matter of Hanbury,* 160 App. Div. 662, 664.)

That confusion still exists is indicated by appellant's experience. When he applied to the Supreme Court for what in effect was a stay (although erroneously in the form of a certificate of reasonable doubt), his application was denied, the court holding that " appeal is not the proper procedure for the review of an adjudication of criminal contempt committed in a criminal case ", and review may be had " only by way of certiorari." (N. Y. L. J., Oct. 19, 1950, p. 871, col. 1.) When he then applied to the same court — but before another Justice — for certiorari,

his application was denied, the court holding that certiorari was unnecessary as the propriety of the order of commitment may be tested on the pending appeal.

In *Matter of Douglas* v. *Adel* (269 N. Y. 144), it was held that a criminal contempt arising out of a civil case, where the contempt was committed in the immediate view and presence of the court and punished summarily, " cannot be adequately reviewed by an appeal ", (p. 148) but should be reviewed by certiorari. It also was held that, where a criminal contempt arising out of a civil case was not committed in the immediate view and presence of the court and not punished summarily, the review should be by appeal. It is not apparent why the same reasoning and conclusions should not apply to a criminal contempt arising out of criminal matter. However, the court stated, *obiter dictum:* " The review [of an order adjudicating criminal contempt] in a criminal case is by certiorari." (P. 149.) But that was perforce the express provision of the then existing statute (Civ. Prac. Act, § 1312 [1935]) which provided: " This article is not applicable to a certiorari brought to review a determination made in *any criminal matter, except a criminal contempt of court."* (Italics mine.)

Prior to the 1947 amendments to section 752 of the Judiciary Law and subdivision 2 of section 1285 of the Civil Practice Act, it was held that the review of a criminal contempt arising out of a criminal case was by certiorari, whether or not the contempt was committed in the immediate view and presence of the court and the punishment was summary. (*People ex rel. Taylor* v. *Forbes*, 143 N. Y. 219; *Matter of Mintz*, 262 App. Div. 86; *People ex rel. Nunns* v. *County Court*, 188 App. Div. 424.) However, it also was held where the punishment was not summary that review may be had by appeal (*People ex rel. Society for Prevention of Cruelty to Children* v. *Gilmore*, 26 Hun 1, revd. as to costs 88 N. Y. 626). Since the enactment of chapter 900 of the Laws of 1947, amending section 752 of the Judiciary Law and subdivision 2 of section 1285 of the Civil Practice Act, certiorari to review criminal contempts in criminal matters is limited to contempts committed in the immediate view and presence of the court and punished summarily. (See Thirteenth Annual Report of N. Y. Judicial Council, 1947, p. 233 *et seq.*) Hence, as the contempt here involved was not committed in the immediate view and presence of the court and not punished summarily, certiorari is not now available to review the order appealed from. The question then is: Has appellant the right to review by appeal?

There is no inherent right to appeal either in civil or criminal matters. There must be statutory authority therefor. (*Croveno* v. *Atlantic Ave. R. R. Co.*, 150 N. Y. 225; *People* v. *Gersewitz*, 294 N. Y. 163.) In my opinion, there is such statutory authority for the present appeal in subdivision 2 of section 631 of the Civil Practice Act, which, so far as material, provides that "An appeal may be taken to the appellate division of the supreme court, * * *. From an order, affecting a substantial right, made by a court of record possessing original jurisdiction, * * * in a special proceeding instituted in that court, * * * pursuant to a special statutory provision * * *."

The order under review was made in a special proceeding (General Construction Law, § 46-a) after notice and the taking of formal proof. The procedure adopted is not provided by the Code of Criminal Procedure, nor is any provision made therein for the procedure in proceedings to punish for contempt, in the case of a refusal to testify, or for the review of any order made in such a proceeding, except in section 619 of that statute, which provides that a refusal to testify may be punished, as for a criminal contempt, in the manner provided in the Judiciary Law. That section formerly provided that such offenses should be punished as provided in the Code of Civil Procedure, and made the form and manner of proceedings adopted to punish such contempts in civil cases apply to similar contempts in criminal matters. The Code of Civil Procedure also provided the manner in which orders made in such proceedings should be reviewed. In 1909, the provisions of that statute, relating to criminal contempts, were transferred to the Judiciary Law, but the provisions relating to review by certiorari and by appeal remained in the Code and are now found in the Civil Practice Act. In *People ex rel. Taylor* v. *Forbes* (143 N. Y. 219, *supra*), which also involved the refusal of a witness to testify before a Grand Jury, it was held, since proceedings to punish for contempt were not provided for in the Code of Criminal Procedure, and since the offense was created and the procedure and punishment were prescribed by the Code of Civil Procedure, that the manner of reviewing the determination was to be found in that statute. Judge O'Brien, writing for the court, concluded that since no provision was made in the Criminal Code for such proceedings or to review an order made therein, " the practice is governed by the same procedure as applies to ordinary cases where private rights are involved " (pp. 223–224). While in that case it was determined that the proper method of review was by way of certiorari, the court was dealing with a contempt

punished summarily, as one committed in the immediate view and presence of the court. In such cases the review always had been by certiorari. On the other hand, in " ordinary cases where private rights were involved " and where the contempt was punished after a hearing and not summarily, the review always has been by appeal (*Matter of Hanbury*, 160 App. Div. 662, *supra; Eastern C. S. Co.* v. *Bricklayers' & M. P. I. U., Local No. 45*, 200 App. Div. 714; *People ex rel. Negus* v. *Dwyer*, 90 N. Y. 402, *supra; Matter of Douglas* v. *Adel*, 269 N. Y. 144, *supra*.)

In my opinion, when the provisions of the Code of Civil Procedure relating to criminal contempts were transferred to the Judiciary Law, the Legislature did not intend to change in any way the practice or procedure which theretofore had existed with respect to the review of orders made in proceedings to punish such contempts. Indeed, there is an indication that the Legislature, in amending subdivision 2 of section 1285 of the Civil Practice Act, and section 752 of the Judiciary Law, in 1947, assumed that in the situation here presented there was an adequate right of review by appeal.

The order under review is appealable, and the merits of the case must be considered.

Section 750 of the Judiciary Law provides that a court of record has power to punish as a criminal contempt a person guilty of " Contumacious and unlawful refusal * * *. after being sworn, to answer any legal and proper interrogatory."

Prior to September 27, 1950, evidence had been adduced before the Grand Jury showing that one Harry Gross was a book-maker and concerning the protection given Gross in his book-making activities by police officers and officials. Evidence also had been presented establishing that Gross maintained a list of police officers and officials, which included among others the name and telephone number of appellant, who then was a detective assigned to the office of the District Attorney of New York County. On September 27, 1950, appellant appeared before the Grand Jury, executed a waiver of immunity, and was sworn as a witness. Among the objectives to which his examination was directed was his attendance at a housewarming and cocktail party given by Gross at the latter's home, and the identity of other members of the police department who were present.

Appellant admitted he had known Gross for ten or twelve years, but denied he had visited at his home. When asked specifically if he had not been there at the housewarming and cock-

tail party, he replied: "I believe I was." He admitted he had been invited and said his brother Jim — a former police official — had extended the invitation. He denied he went with his brother and stated he was accompanied by his wife. He said he did not know Gross was a book-maker but "presumed he was in the gambling business; it did not matter to me." He testified that, when he arrived at Gross's house, he met "quite a few" members of the police department. "Q. How many would you say were in Gross's house when you went there with Mrs. Reardon, at this cocktail party? A. Offhand, about ten I knew." When asked which ones he recognized he replied: "My brother Jim * * * I did not know any of them. I don't work with them." He also stated the only one he knew was Bill Ross, and explained "I was pretty tight when I arrived and I got more tight throughout the evening." When pressed to tell the others he knew, he repeated that there were ten members of the department whom he recognized, but insisted he did not see Inspector Corell, Lieutenant Schultheis, and Patrolman O'Brien, although he did see Bill Ross, who had resigned from the department the morning appellant was testifying. He admitted he met Gross's wife there and that was the only time he had met her.

When recalled on September 29th, appellant again stated that he went to the cocktail party with his wife. His former testimony was then read to him and, when asked about the cocktail party, he replied: "I wish to state that I was drunk when I went there and I passed out cold ". "Q. Do you mean to testify now that you don't remember, even remember that you were there? A. I do, sir." When reminded that he previously had testified that he had been invited to the party by his brother but the latter did not take him there, he replied: "My brother Jimmy picked me up in some place and brought me there. That is what I was told. * * * I was pretty stewed at the time, and frankly I was told later at my mother's he picked me up. * * * My wife was with my brother." He then testified he did not remember meeting Gross's wife there.

While appellant did not categorically refuse to answer any question, his commitment for contempt nevertheless may be upheld. What was stated in *Matter of Finkel* v. *McCook* (247 App. Div. 57, 62; affd. 271 N. Y. 636) is pertinent and decisive. " If the commitment is to be upheld, it is to be upheld only on the conclusion that the petitioner had refused to answer legal and proper interrogatories. The statute uses the word ' refusal.' This does not mean, however, that any answer no

matter how improbable, inconsistent, evasive, contradictory or obviously untruthful will forestall the summary action of the court. An ' answer ' considered in relation to other answers of the same witness may be so absurd, deceptive and prevaricated to such an extent that it amounts to a refusal to answer. Mere lip service is not contemplated by the statute. To hold otherwise would be emphasizing form at the expense of substance. In *Matter of Rosenberg* (90 Wis. 581; 63 N. W. 1065; 64 id. 299) it was said: ' Prevarication by a witness has the same effect upon the administration of justice as a refusal to answer. To the same effect it puts the witness in the position of standing out against the authority of the court, and thwarts the court in its effect and purpose of doing justice between the parties. It is contumacy. It is direct contempt of the authority of the court.' "

A reading of the entire record conclusively establishes that appellant's testimony was not only false but patently improbable, inconsistent and evasive; that he was concealing the truth and, without doubt, deliberately refusing to tell what he knew. The court was not required to believe appellant's belated explanation that he was so drunk that he could not remember that he was at the cocktail party. He distinctly remembered meeting about ten members of the police department, whom he knew. It was not without significance that, while he remembered that his brother Jim — no longer attached to the force — and Bill Ross, who had resigned that very morning, were both present, he was unable to give the name of even one of the ten members of the department whom he knew, although he was able to state that certain other designated police officers were not among the guests. It is apparent that appellant's testimony was designed to impede the investigation and to obstruct the Grand Jury in the performance of its duty; that it tended to impair the respect due the court's authority is palpable. Hence, appellant was guilty of contumacious and unlawful refusal to answer legal and proper interrogatories, contrary to the statute.

The order adjudging appellant guilty of contempt should be affirmed, without costs, and the appeal from the judgment convicting him of contempt dismissed, without costs. There is no such judgment in the record.

NOLAN, P. J., ADEL, WENZEL and MCCRATE, JJ., concur.

Order of the County Court, Kings County, adjudging appellant guilty of criminal contempt of court, affirmed, without costs. Appeal from judgment convicting him of contempt dismissed, without costs. There is no such judgment in the record.